The Union Central Life Insurance Company v. Pauly.

Filed Nov. 9, 1893.

---

No. 633.

The Union Central Life Insurance Company v. Pauly.

Appellate Court Practice.—*Sufficiency of Complaint on Appeal.— How Tested.*—A single paragraph of a complaint containing several paragraphs can not be questioned for the first time in the appellate tribunal. Only the entire complaint can be thus questioned.

Life Insurance.—*Warranties, What Amounts to.— Cancellation of Policy.*—Warranties in insurance policies are not favored in law, and the court will construe as a warranty that only which the parties have plainly and unequivocally declared to be such. And where the terms of the policy prescribe the penalty for misrepresentations in the application to be a right of cancellation of the policy by the company, it can not be held, by reason of the indefinite provisions of the application, to have intended a much severer penalty.

Same.—*Warranties.—Construction of Policy.*—Where it is uncertain whether statements in an application for insurance are to be taken as warranties or representations, the construction most favorable to the policy-holder will be adopted.

Same.—*Consummated Contract.—Failure of Payment of Premium and Delivery of Policy.*—While a consummated contract may exist without either payment of premium or delivery of policy, yet such cases

are exceptional, and must be supported by very strong and satisfactory proof. And where all the evidence is consistent with the idea that there were simply negotiations looking toward an insurance, such a contract can not be established thereby.

SAME.—*Constructive Delivery of Policy.—Waiver of Payment of Premium. —Agent Holding Policy in Trust.*—Where there is no indication of any purpose to contract other than by a policy to be made and de-delivered upon payment of at least half of the premium, the fact that the insurance agent wrote the person seeking insurance, saying, "Your policy has come; the first time you are in town come around and get your policy," does not show a constructive delivery of the policy, a waiver of payment, and a consummation of the contract, neither does it show that the agent simply held the policy in trust for the insured.

SAME.—*Refusal of Agent to Consummate Contract,—Sickness and Death of Insured.*—Considering the facts that the negotiations for a policy occurred about September 28; that the insured was notified by postal card of the arrival of his policy; that two or three weeks thereafter a son of the insured called for the policy and tendered the amount of the premium, the insured being sick October 10th, and still sick November 21st and 28th, and still sick and unable to go and get his policy on the 6th of December, the date of tender of the premium, the agent was justified in refusing to consummate the contract, and, upon the death of the insured, was justified in returning the policy to his principal.

From the Gibson Circuit Court.

*J. H. Miller, T. Duncan, W. M. Ramsey, L. Maxwell* and *R. Ramsey,* for appellant.

*M. W. Fields* and *J. W. Ewing,* for appellee.

GAVIN, C. J.—The appellee brought suit against appellant to recover the amount of a policy ($2,000) alleged to have been executed by appellant upon the life of her husband, William Pauly, who died March 1, 1890. The policy is dated October 1, 1889. The principal allegations of the complaint, in detail, are that appellants solicited said William Pauly to take out insurance, and he thereupon applied for a $2,000 policy upon the endowment life-rate plan, payable to appellee; that appellant refused to accept this application and notified its agent of

such refusal, but at the same time notified him that the insurance would be accepted on the ten-year endowment plan; that on October 25, the agent, Daily, so notified said William Pauly, who agreed to accept the same, upon the agent's promise to wait for the first premium until December, and until said William Pauly sold his hogs; that thereupon, by his direction, said agent notified the company that Pauly would accept a $2,000 policy on the ten-year endowment plan, payable to said appellee,— whereupon, said company made out such a policy and mailed it to said agent for delivery; that on November 20th said agent notified Pauly, by card, that his policy had come, and to send in for it; that on November 29, said Pauly sent his son to pay the premium and get the policy, but the agent refused to deliver it or to accept the premium, but promised to bring it out to him in a few days, but he failed and refused to deliver it, and, on April —, 1890, returned it to appellant; that said William Pauly and this plaintiff have in all things complied with the provisions of said contract of insurance.

To this complaint there was an answer of general denial, and also of breach of warranty as to certain statements in the application.

The insufficiency of the third paragraph of the complaint is assigned for error in this court. Our statute does not authorize the separate paragraphs of a complaint to be thus questioned for the first time in the Appellate Court. It is only the entire complaint which can be thus tested. *Tachau* v. *Fiedeldey*, 81 Ind. 54; *Ashton* v. *Shepherd*, 120 Ind. 69.

No question is therefore presented for our determination under this assignment.

After trial by a jury, and verdict for appellee, judgment was rendered in her favor over the appellant's motion for a new trial.

The action of the court in overruling this motion is the error urged here.

Under this motion, the sufficiency of the evidence and the correctness of the court's action as to certain instruc· tions and interrogatories are brought before us.

In the application, this question was contained: "Have you required the services of a physician during the last seven years? If so, state what for and when; also give his name and address."

To this, the answer was "No."

It is urged, by appellant, that this statement constituted a warranty, for a breach of which the policy was avoided.

With this view of the law we are unable to agree.

By reason of their stringent character, warranties in insurance policies are not favored in law. The court will construe as a warranty that only which the parties have plainly and unequivocally declared to be such. *Sup. Lodge, A. O. U. W.,* v. *Hutchinson,* 6 Ind. App. 399, 33 N. E. Rep. 817; *North Western, etc., Life Ins. Co.* v. *Hazlett,* 105 Ind. 212; *Rogers* v. *Phenix Ins. Co.,* 121 Ind. 570; *Penn., etc., Life Ins. Co* v. *Wiler,* 100 Ind. 92.

We are by no means ready to decide that, even by the terms of the application, this statement is made a warranty; but even if it were, it could not be so construed in the light of the provisions of the policy. By the express terms of the policy, it is issued on condition that "in case any statements or declarations made in the application for this policy are in any material respect untrue," * * * "the company may, at its option, cancel this policy." Having, by this express language, provided the remedy for any false statements, and prescribed the character of false statements to which the penalty shall attach, it can not be held, by reason of the

indefinite provisions of the application, to have intended a much severer penalty for any untruth in the statements made regardless of their materiality. The policy and application must be construed together, and if, when so construed, it is left uncertain whether statements are to be taken as warranties or representations, the construction most favorable to the policy-holder is to be adopted. This subject has been but recently fully discussed by Judge DAVIS, in the case of *Indiana Farmers', etc., Ins. Co.* v. *Rundell, Admr.*, 7 Ind. App. 426, 34 N. E. Rep. 588, to which we refer, and to the numerous authorities therein cited.

We next come to the question as to whether or not the verdict is sustained by the evidence, when applied to an issue formed by the general denial. As to the evidence itself, there is substantially no conflict, the differences between counsel being with reference to the inferences of fact which are fairly and reasonably deducible from the evidence, and the result of the application of the law thereto.

Dr. Paul H. Curtner testified that he made the medical examination of deceased, September 28, 1889; that he had a conversation with Daily, the agent, two or three weeks afterwards, at the post-office, in which he told Daily that Pauly was very sick, and Daily said: "I have just received Pauly's policy, and I will take it out to him this evening or in the morning."

D. O. Daily: I was agent of Union Central Life Insurance Co. in September and October, 1889. I received this policy on the 10th day of October, 1889. I sent this application of William Pauly to the Union Central Life Insurance Co. I sent the policy back to the company about the 10th of March, 1890. I sent a postal-card to William Pauly on the subject of life insurance.

The policy was offered in evidence, and contains this

provision as a condition upon which it is accepted: "First. This policy shall not be valid or binding until the first premium is paid to the company, or its authorized agent, and the receipt hereto attached, countersigned by the company's agent and delivered during the lifetime of the insured."

The policy is dated October 1, 1889, for $2,000, upon the ten-year endowment plan.

The application is for $2,000 on the endowment life plan.

Nancy Pauly: "Daily was at our house talking life insurance in wheat-sowing time. Last time Daily was there was before the Vincennes fair. He asked William which he wanted, the ten or twenty-year plan. William answered: "Fix it whichever way you think is best." I did not hear all the conversation. I saw a postal-card from Daily, which is now lost. There was but one card.

Newton Pauly: Saw Daily at our house several times, once in a field with another man in wheat sowing time. Saw card. It read: "Mr. Pauly—Your policy has come. The first time you are in town come around and get your policy, and oblige, D. O. Daily." Don't remember that Daily was there any more. Remember selling the hogs. Card came about one week before Brother Willis and others took the hogs off. Don't remember date, but it was after wheat sowing. Am son of Wm. Pauly. Sold hogs three or four weeks after we sowed wheat. We sowed wheat last of September. Father was sick in bed when the card came. Last time I knew of father's being in Hazelton was on Thursday of Vincennes fair, first part of October. Father got his mail at Hazelton about once or twice a week. Got the card through Hazelton postoffice.

Willis Pauly: Knew of postal card coming. Went to see Daily afterwards at father's request. We took the

hogs to Hazelton two or three weeks after postal card came. I told Mr. Daily that I came after the policy. He said he couldn't send it out. I told him I had the money for him. Daily says: I suppose you have, but you will have to wait until your father gets better. I will bring it out in a few days, after he gets better. I went to see Daily one or two weeks after selling the hogs. I had the money to pay the insurance when I went to see Daily. We sold the hogs November 28th, 1889. I went to see Daily a week or so after that date. Father was not with us when we sold the hogs. Father was not able to go along when I went to get the policy. He was sick at both of these times.

Letter of secretary of the company says: "The company acknowledges no liability under policy No. 63,913 that had been issued by it on the life of Wm. Pauly in October last," but sends blanks as a matter of courtesy.

E. P. Marshall: Secretary of appellant. From its organization to the present time our company has pursued but one method of writing insurance, and that is upon a written application of the insured.

Wm. Pauly's application for $2,000 life rate endowment was received by us from Chicago department and referred to medical department. Medical directors decided that a policy should not issue on the plan proposed, but that a ten year endowment policy might issue, and a policy upon this plan was then prepared and sent through the Chicago agency to Daily in the expectation that he could induce him to accept it instead of a policy such as he had applied for. It was sent without any special instructions to Daily as to its return if declined, but subject to the uniform rule of the company, which appears in the printed manual held by all agents, including Daily. This rule is that policies not delivered to the insured and paid for shall be returned to the home office

within sixty days from date of issue. We received no notice from the time the policy was sent, in reference to it. Pauly never made any other application. We issued no other policy. No premium was ever paid. The agent was not authorized to deliver the policy without payment of the premium, and he had no authority or power to deliver it at all after sixty days from its date, under the rule of the company, under which Daily was then working. After the sixty days, it could only be delivered upon the certificate of the medical examiner that the applicant was still in good health, upon receipt of which the company authorized the delivery and not otherwise. It was also a rule of the company, which was known to Daily and constituted a part of his instructions, that no policy is to be delivered to a sick man, except where, in advance of the policy, there has been executed special printed binding contract signed by the agent, and accompanied by payment of the premium. In this case there was no authority given to the agent to vary from these rules. Policy was never delivered, and was returned to us in March, 1890.

Our register has a memorandum of the policy (setting it out) showing date, amount, etc., made when policy was sent out to Chicago agency, and a notation of the amount of first premium charged to it.

This comprised the appellee's evidence.

For the defendant. ·

D. O. Daily: My only instructions were in a manual, viz.: "When you receive a policy from the home office for collection, you must not deliver if you know of any unfavorable change in the habits or health of the person on whose life it is issued. You must not, in any case, deliver a policy or renewal receipt until the premium is paid." And, again, the manual contained this instruction: "Should the health of the applicant become im-

paired, or anything transpire or come to the knowledge of the agent, making the risk less desirable after the application is taken and before actual delivery of the policy, the agent must notify the company of the facts and not deliver, but return the policy to the home office immediately.'' I had the above instructions, and none others, at the time I refused to deliver the policy. Pauly never saw the policy. I received it about October 10th, 1889. I went to Pauly's house to tell him that the company had declined his application on the plan proposed, but would accept the risk on another plan. The ten year endowment plan. The premium on the plan proposed first was $63 per $1,000, while on the latter plan it was $93. Pauly objected to the increase of premium. Finally he said, I guess I will take $1,000 on the plan you name. I wrote the postal card October 10th, and called at Pauly's house October 14th. I saw one of Pauly's sons and told him to come and get the policy. No one came until Willis came. Pauly never wrote me and never paid anything on the policy.

When Pauly agreed to take the $1,000 I agreed to give him six months on the half, he to pay half cash. I probably said to Dr. Gudgel in the month of March or April that I had to give Pauly time on one-half the premium. This was October 6th, and last time I saw Pauly. It was after I had received word that the company would not accept his application on first plan. There was nothing said about waiting until he sold his hogs.

Dr. Gudgel testified that in March, shortly after Pauly's death, Daily told him that in order to get Pauly to take insurance he had to give him time on one-half the premium.

There is here neither payment to the company nor actual delivery of the policy. Is the evidence such as to

justify us in saying that a verdict, that there was a valid contract of insurance, is sustained by it?

It is undoubtedly true that while, as a general rule, the delivery of the policy and payment of the premium, either in money or by note, both accrue when the contract is consummated, still it is also true that there may be a valid and enforceable contract of insurance without payment or without a manual delivery of the policy. *Hamilton* v. *Lycoming, etc., Ins. Co.* 5 Barr (Pa. St.), 339; *Cronkhite* v. *Accident Ins. Co.*, 35 Fed. Rep. 26; *Carpenter* v. *Mutual, etc., Ins. Co.*, 4 Sandf. Ch. 408; *Tayloe* v. *Merchants, etc., Ins. Co.*, 9 How. ( U. S.) 390; *Fried* v. *Royal Ins. Co.*, 50 N. Y. 253; *Kentucky, etc., Ins. Co.* v. *Jenks*, 5 Ind. 96.

Such contract may also exist without either payment of premium or delivery of policy. *Bragdon* v. *Appleton, etc., Ins. Co.*, 42 Me. 259; *Collins* v. *Ins. Co.*, 7 Phil. 201; *Kohne* v. *Ins. Co.*, 1 Wash. (C. C.) 93; *Sheldon* v. *Conn., etc., Ins. Co.*, 25 Conn. 207; *Hallock* v. *Commercial Ins. Co.* 2 Dutch. 268; *Commercial Ins. Co.* v. *Hallock*, 3 Dutch. 645; *Xenos* v. *Wickham*, 2 L. R. (H. of L. Cases), 296; *New England Fire, etc., Ins. Co.* v. *Robinson*, 25 Ind. 537.

Yet such cases are recognized as exceptional, and in order to sustain them the proof, whether direct or circumstantial, should be of such a character as to reasonably support the assertion.

Bliss on Life Insurance, p. 229, section 154, enunciates this rule: "In life insurance, the policy always provides that it is not to take effect until the first premium is paid. In such cases, if there is no actual delivery of the policy under such circumstances that a waiver of payment of the premium may be inferred, there must be some satisfactory proof that the premium was so paid, or that its payment was in fact waived. While

neither payment nor delivery nor both combined are conclusive, it would, on the one hand, require very strong proof to show a binding contract where neither had taken place, as, on the other hand, it would require strong proof to overcome the presumption of a completed contract arising from payment and delivery combined.''

In *Cronkhite* v. *Accident Ins. Co.* (Fed.), 17 Ins. Law Jour. 509, BREWER, J., says: "A party should not be called on to pay where it has in fact received nothing, unless there is some clear and positive reason upon which the demand rests.''

Keeping in mind the well established rule of our court that where there is a conflict of evidence we will not undertake to weigh it, we are still unable to find in the evidence of this case any from which it may be reasonably and legitimately inferred that there was here a binding and completed contract of insurance. All of the evidence is consistent with the idea that there were simply negotiations looking toward an insurance.

There is no indication of any purpose to contract other than by a policy to be made and delivered upon payment of at least half of the premium. *Heiman* v. *Phœnix Mut. Life Ins. Co.*, 17 Minn. 153; *Markey* v. *Mut. Ben. Life Ins. Co.*, 103 Mass. 78.

There is here an entire want of proof that the agent in any manner waived payment or gave any credit, except as to one-half the premium.

Counsel for the appellee rely largely upon the postal-card, for proof that there was a constructive delivery of the policy and a consummation of the contract. It is urged that by the language, "your policy," used in this card, the idea is conveyed that the policy then actually belonged to Pauly, and that the agent simply held it as a trustee for him. When all the surrounding circumstances, as to which there is no dispute, are regarded,

such a construction seems to us untenable.    Such an inference can not fairly and legitimately follow simply from the language of the card, which, when considered in the light of attendant circumstances, can mean only that the policy written for Pauly had come.

Counsel for the appellee support their proposition that the "contract was executed, and that there was nothing further to be done," when the postal card was written, by the cases of *Cooper* v. *Pacific Mut. Life Ins. Co.*, 7 Nev. 116, and *Tayloe* v. *Merchants' Fire Ins. Co.*, 9 How. (U. S.) 390.

In the former of these cases, $50 was paid when the application was made, which was, according to the company's regulations, to be applied on the first year's premium, provided the company should conclude to make the insurance.    The company did so conclude, entered its conclusion on its books and forwarded policy to agent, and the money paid thereby became the money of the company, and the beneficiary became entitled to a policy upon complying with the other terms of the contract, which she offered to do in strict accordance therewith, although her husband had taken sick and died after the acceptance of the application and before the delivery of the policy to her.

In the Tayloe case, Tayloe applied for insurance, the company wrote the agent it would take it at a certain rate. The agent so notified Tayloe, telling him that if he desired to effect insurance to send him a check and the "matter is concluded."    On the day after receiving this letter, Tayloe sent a check by mail, with directions to leave the policy at a bank.    The insurance was held to take effect from the mailing of the check, the matter being then "concluded" so far as effecting a completed contract was concerned.

These cases present very different features from the

The Union Central Life Insurance Company v. Pauly.

one at bar, where there is neither payment nor waiver nor anything shown to have been accepted as a compliance with the contract.

In the cases of *Kentucky, etc., Ins. Co.* v. *Jenks, supra,* and *New England Fire, etc., Ins. Co.* v. *Robinson, supra,* there were clear and distinct contracts for insurance, the terms of which were fully complied with by the insured.

If the minds of the parties ever met, and an agreement for an insurance was made, it must have been upon the 6th of October, which was the last time that Daily saw Pauly. Whatever the arrangement then made was, whether for $1,000 or $2,000, there is not a scintilla of evidence that there was any waiver of payment of more than half the premium. Pauly then understood he was to pay half cash, at least. Word was left with his son, on the 14th, that the policy had come, yet he made no move toward payment or consummation of the contract until December 6th.

The agent certainly acted with diligence. He wrote him a card about the 10th, and went out in person on the 14th, but no response came from Pauly. We are unable to see that it was incumbent upon the agent to specifically urge payment upon Pauly as a condition to his policy's becoming effectual, nor can we hold, as urged by counsel, that his failure to do so is to be deemed a waiver of payment. Presumptively, the payment of the premium and the delivery and effectiveness of the policy would go hand in hand. May on Insurance, section 56; *Heiman* v. *Phœnix Mut. Life Ins. Co., supra.*

Pauly had no right to expect anything else, unless by special agreement.

There was, as we construe it, nothing in Daily's postal card which could have tended to raise in Pauly's

mind the belief that his policy was in force, although not paid for.

Under the circumstances of this case, taking into consideration the time which elapsed between the negotiations and the tender, and the fact that Pauly was sick about the 10th of October; was sick about the 21st of November; was sick and unable to go to sell his hogs on November 28th, and was sick and unable to go to town on the 6th of December, we are of opinion that the agent was justified in declining, and in good faith to his company he was required to decline, to consummate the contract on the 6th of December, when the tender was made.

The judgment is reversed, with instructions to the trial court to sustain appellant's motion for a new trial.

Filed Nov. 1, 1893.